**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| CATHERINE KRATTENMAKER, derivatively on behalf of CEPHALON, INC., |
| |
| Plaintiff, |
| |
| -against- |
| |
| FRANK BALDINO, J. KEVIN BUCHI, WILLIAM P. EGAN, MARTYN D. GREENACRE, GAIL R. WILENSKY, VAUGHN M. KAILIAN, CHARLES A. SANDERS, DENNIS L. WINGER AND KEVIN E. MOLEY, |
| |
| Defendants, |
| |
| -and- |
| |
| CEPHALON, INC., |
| |
| Nominal Defendant. |

NO.  07-CV-101

**MOTION OF DEFENDANTS FOR JUDGMENT ON THE PLEADINGS**

Defendants Frank Baldino, J. Kevin Buchi, William P. Egan, Martyn D.

Greenacre, Gail R. Wilensky, Vaugh M. Kailian, Charles A. Sanders, Dennis L. Winger and

Kevin E. Moley, and nominal Defendant Cephalon, Inc., hereby move for judgment on the

pleadings, pursuant to Federal Rules of Civil Procedure 9(b), 12(c) and 23.1, dismissing the

Verified Shareholders' Derivative Complaint on the grounds that plaintiff failed to make demand

on Cephalon's Board of Directors or state a claim upon which relief can be granted.  Grounds

supporting the Motion are set forth in the accompanying Memorandum.

Dated: Philadelphia, PA                    Respectfully submitted,
      March 7, 2007


                    /s/ MLK6620
                Steven B. Feirson
                Michael L. Kichline
                Michael J. Newman
                DECHERT LLP
                Cira Centre, 2929 Arch Street
                Philadelphia, PA 19104
                215.994.4000

                *Attorneys for the Defendants*
                *Frank Baldino, J. Kevin Buchi, William P.*
                *Egan, Martyn D. Greenacre, Gail R.*
                *Wilensky, Vaughn M. Kailian, Charles A.*
                *Sanders, Dennis L. Winger, Kevin E. Moley,*
                *and Cephalon, Inc.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

CATHERINE KRATTENMAKER, derivatively
on behalf of CEPHALON, INC.,

        Plaintiff,

   -against-

FRANK BALDINO, J. KEVIN BUCHI,
WILLIAM P. EGAN, MARTYN D.
GREENACRE, GAIL R. WILENSKY,
VAUGHN M. KAILIAN, CHARLES A.
SANDERS, DENNIS L. WINGER AND KEVIN
E. MOLEY,

        Defendants,

   -and-

CEPHALON, INC.,

        Nominal Defendant.

NO. 07-CV-101

## MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

**Page**

Preliminary Statement ..................................................................................................... 1

Background ........................................................................................................................ 4

    A.    The Parties ...................................................................................................... 4

    B.    Actiq................................................................................................................. 6

        1.    General Background ........................................................................ 6

        2.    Connecticut Investigation .............................................................. 6

    C.    The Complaint's Allegations ......................................................................... 7

Argument ........................................................................................................................... 9

I.    Plaintiff Failed To Make A Proper Demand On Cephalon's Board of  Directors And Has Not Pled Adequately That Demand Would Have Been Futile ......................... 10

    A.    The Board Of Directors Has The Right To Decide Whether To Initiate Litigation........................................................................................................ 10

    B.    Demand Is Not Excused Unless Plaintiff Shows Demand Would Be Futile....... 11

    C.    Plaintiff Has Not Pled Particularized Facts Showing How The Directors Are "Beholden"............................................................................................. 12

        1.    Domination and Control ............................................................... 13

        2.    Relationships................................................................................. 14

        3.    Board Appointment ...................................................................... 15

    D.    Plaintiff Has Not Pled Any Facts Showing That A Majority Of The Board Of Directors Are "Interested" ...................................................................... 16

        1.    Compensation Does Not Amount To "Interest" ........................... 17

        2.    Naming Directors As Defendants Does Not Create "Interest"................ 17

        3.    Plaintiff's Allegations Fail To Establish Substantial Likelihood Of Liability........................................................................................ 18

II.    The Complaint Is Rife With Legal And Factual Defects That The Board Should Be Permitted To Consider Upon Proper Demand............................................... 19

    A.    The Board Should Be Permitted To Consider The Numerous Threshold Defects Of The Complaint ......................................................................... 20

        1.    Lack of Standing........................................................................... 20

        2.    Failure to Define Temporal Scope ................................................ 20

        3.    Failure to Allege Injury to the Corporation .................................. 21

**TABLE OF CONTENTS**
(continued)

**Page**

4.    Prematurity ........................................................................ 22

5.    Claim Is Not Really Derivative .......................................... 23

B.    The Board Should Be Permitted To Consider The Substantive Failings Of The Claims ......................................................................................... 23

1.    Failure to Exercise Oversight ............................................ 23

2.    Constructive Fraud ............................................................ 28

3.    Unjust Enrichment ............................................................ 30

Conclusion ........................................................................................................ 34

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795
 (7th Cir. 2003)......................................................................................................25

*Allstate Transport Co., Inc. v. Southeastern Pa. Transport Authority*,
 Civ. A. No. 97-1482, 1998 U.S. Dist. LEXIS 1740 (E.D. Pa. Feb. 13, 1998)...............9

*Amalgamated Bank v. Yost*, No. Civ. A. *04-0972*, 2005 U.S. Dist. LEXIS 1280
 (E.D. Pa. Jan. 31, 2005) ........................................................10, 26, 27, 31, 32, 33

*Blasband v. Rales*, 971 F.2d 1034 (3d Cir. 1992)............................................................10

*In re Burlington Coat Factory Sec. Litigation*, 114 F.3d 1410 (3d Cir. 1997)...................9

*Clark v. Lacy*, 376 F.3d 682 (7th Cir. 2004)...................................................................24

*In re Cray Inc. Derivative Litigation*, 431 F. Supp. 2d 1114 (D. Wash. 2006).................22

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)......................................................11

*Dollens v. Zionts*, No. 01 C 2826, 2002 U.S. Dist. LEXIS 13511
 (N.D. Ill. July 22, 2002).......................................................................................22

*Ford v. Schering-Plough Corp.*, 145 F.3d 601 (3d Cir. 1998) ...........................................9

*Johnson v. Heimbach*, CIVIL ACTION No. 03-2483, 2003 U.S. Dist.
 LEXIS 22194 (E.D. Pa. Nov. 25, 2003) .................................................................30

*Kamen v. Kemper Finance Services Inc.*, 500 U.S. 90 (1991) ....................................10, 11

*Morse v. Lower Merion Sch. District*, 132 F.3d 902 (3d Cir. 1997)....................................4

*In re NAHC, Inc. Sec. Litigation*, 306 F.3d 1314 (3d Cir. 2002)........................................5

*Poland v. Caldwell*, Nos. 89-645, 89-1255, 1990 WL 158479
 (E.D. Pa. Oct. 12, 1990).......................................................................................17

*In re Ravisent Tech., Inc.*, No. Civ. A. 00-CV-1014, 2004 WL 1563024
 (E.D. Pa. July 13, 2004)..........................................................................................5

*Seville Industrial Machine Corp. v. Southmost Machine Corp.*,
 742 F.2d 786 (3d Cir. 1984)..................................................................................30

*Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004)..................................................................9

*In re Suprema Specialties, Inc. Sec. Litigation*, 438 F.3d 256 (3d Cir. 2006)...................30

*In re Symbol Techs. Sec. Litigation*, 762 F. Supp. 510 (E.D.N.Y. 1991) .........................22

*United Copper Security Co. v. Amalgamated Copper Co.*,
    244 U.S. 261 (1917)..........................................................................................................11

*In re United Telecomms., Sec. Litigation*, No. 90-2251-EEO, 1993 U.S. Dist.
    LEXIS 4749 (D. Kan. March 4, 1993)..........................................................................22

*In re Westinghouse Sec. Litigation*, 90 F.3d 696 (3d Cir. 1996) .......................................30

### STATE CASES

*Arnold v. Society for Sav. Bancorp.*, 650 A.2d 1270, 1287 (Del. 1994)............................30

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds by*
    *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ..............................................10, 11, 12, 13,
    .........................................................................................................................19, 20, 27

*In re Baxter International, Inc. Shareholders Litigation*,
    654 A.2d 1268 (Del. Ch. 1995)...................................................................25, 26, 27

*Beam v. Stewart*, 833 A.2d 961 (Del. Ch. 2003) .............................................................17

*Beam v. Stewart*, 845 A.2d 1040 (Del. 2004) .............................................................14, 15

*Brehm v. Eisner*, 746 A.2d at 244 (Del. 2000) ......................................................11, 17, 18

*In re Caremark Int'l Derivative Litigation*, 698 A.2d 959
    (Del. Ch. 1996) ....................................................................................................24, 25, 26

*Citron v. Merritt-Chapman & Scott Corp.*, 409 A.2d 607 (Del. Ch. 1977),
    *aff'd*, 407 A.2d 1040 (Del. 1979) ...........................................................................21, 22

*David B. Shaev Profit Sharing Account v. Armstrong*, C.A. No. 1449-N,
    2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006)......................................................25

*Fleer Corporation v. Topps Chewing Gum, Inc.* 539 A.2d 1060
    (Del. 1988) .....................................................................................................................30

*Gagliardi v. TriFoods International, Inc.*, 683 A.2d 1049 (Del. Ch. 1996)......................18

*Graham v. Allis-Chalmers Manufacturing Co.*, 188 A.2d 125 (Del. 1963) .....................25

*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996) *overruled on other grounds by*

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ............................................................... 11

*Grobow v. Perot*, 539 A.2d 180 (Del. 1988) *overruled on other grounds by*
    *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ............................................ 17, 18

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003) ............................ 18, 24, 25, 31, 32, 33

*Jackson National Life Insurance Co. v. Kennedy*, 741 A.2d 377 (Del. Ch. 1999) ............ 30

*Jacobs v. Yang*, C.A. No. 206-N, 2004 Del. Ch. LEXIS 117
    (Del. Ch. Aug. 2, 2004) ............................................................................. 18

*Kramer v. Western Pacific Industrial, Inc.*, 546 A.2d 348 (Del. 1988) ........................... 20

*Levine v. Smith*, Civ. A. No. 8833, 1989 WL 150784 (Del. Ch. Nov. 27, 1989)
    *aff'd* 591 A.2d 194 (Del. 1991) ................................................................. 19

*Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984) ........................................................ 20

*Litt v. Wycoff*, C.A. No. 19083-NC, 2003 Del. Ch. LEXIS 23
    (Del. Ch. March 28, 2003) ........................................................................ 14

*Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135 (Del. 1997) .............................. 29

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) ............................................... 28, 29

*Nufarm v. RAM Research*, C.A. No. 16179, 1998 Del. Ch. LEXIS 182
    (Del. Ch. Sept. 15, 1998) ......................................................................... 31

*In re Oracle Corp. Derivative Litigation*, 867 A.2d 904 (Del. Ch. 2004),
    *aff'd* 2005 Del. LEXIS 150 (Del. April 14, 2005) ....................................... 32

*Pogostin v. Rice*, 480 A.2d 619 (Del. 1984), *overruled on other grounds by*
    *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) .............................................. 18

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ...................................................... 11, 12

*Rosenberg v. Oolie*, Civ. A. No. 11,134, 1989 WL 122084
    (Del. Ch. Oct. 16, 1989) ........................................................................... 32

*Seminaris v. Landa*, 662 A.2d 1350 (Del. Ch. 1995) ......................................... 11, 12, 19

*Shock v. Nash*, 732 A.2d 217 (Del. 1999) ............................................................ 30

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ............................... 11, 24, 25, 26, 27

*Stroud v. Grace*, 606 A.2d 75 (Del. 1992) ........................................................... 29

*Technicorp International II, Inc., v. Johnson,* No. Civ. A. 15084,
   2000 WL. 713750 (Del. Ch. May 31, 2000)................................................................31

*Trenwick America Litigation Trust v. Ernst & Young, L.L.P.,*
   906 A.2d 168 (Del. Ch. 2006)....................................................................................29

*In re Walt Disney Co. Derivative Litigation,* 906 A.2d 27 (Del. 2006)..............................25

*White v. Panic,* 793 A.2d 356 (Del. Ch. 2000) ................................................................15

## STATUTES

Fed. R. Civ. P. 9(b)  ...........................................................................................1, 4, 30

Fed. R. Civ. P. 12(b)(6)...............................................................................................9

Fed. R. Civ. P.12(c) .........................................................................................1, 4, 9

Fed. R. Civ. P. 23.1  ...............................................................................1, 4, 10, 18

Del. Code tit. 8 § 102 ..........................................................................................26, 30

## MISCELLANEOUS

1 *Blackstone's Commentairies* 475......................................................................................10

1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private
Corporations* § 4226.0...................................................................................................10

Defendants Frank Baldino, J. Kevin Buchi, William P. Egan, Martyn D. Greenacre, Gail R. Wilensky, Vaugh M. Kailian, Charles A. Sanders, Dennis L. Winger and Kevin E. Moley (collectively, the "Individual Defendants"), and nominal Defendant Cephalon, Inc. ("Cephalon" or the "Company"), submit this Memorandum in support of their Motion for Judgment on the Pleadings, pursuant to Federal Rules of Civil Procedure 9(b), 12(c) and 23.1, dismissing the Verified Shareholders' Derivative Complaint filed on or about January 9, 2007 (the "Complaint" or "Compl.") on the grounds that plaintiff failed to make demand on Cephalon's Board of Directors (the "Board") or state a claim upon which relief can be granted.

### Preliminary Statement

Cephalon is a Frazer, Pennsylvania-based company engaged in the discovery, development and sale of pharmaceuticals, including Actiq, which is FDA-approved for break-through pain in cancer patients.  In 2004, Cephalon publicly announced that the Attorney General of the State of Connecticut had commenced an investigation into the Company's sales and marketing practices for Actiq (the "Connecticut Investigation").  Although the Connecticut Investigation has been on-going for several years, no conclusions have been reached, no government or regulatory action has been taken, and no fine, penalty or other liability imposed. Nevertheless, plaintiff Catherine Krattenmaker, a purported shareholder, relying solely upon press coverage of the Connecticut Investigation, brought this action against the directors and officers of the Company, claiming that they breached their duties by failing to oversee the marketing and sales of Actiq.

As an initial matter, it is important to note that the Complaint — consisting of largely conclusory and redundant allegations — is a strange hybrid.  Although labeled as a

"derivative" action seeking relief on behalf of the Company, the Complaint reads more like a securities action alleging fraud and deceit on behalf of the shareholders. Indeed, every count of the Complaint includes what appear to be allegations of non-derivative securities fraud allegedly perpetrated on shareholders. However, since any purported securities claim would be barred by the two year statute of limitations, which began to run in November 2004 when the Connecticut Investigation was disclosed, plaintiff and her lawyers appear to be attempting to use the derivative vehicle as their device to advance these time-barred (and meritless) securities claims.

Even taking plaintiff's "derivative" label at face value, however, the Complaint must be dismissed. First of all, plaintiff failed to make a pre-suit demand on the Board and, as a result, usurped Cephalon's right under Delaware law – which governs this matter – to control its own claims. Delaware law does not allow a shareholder and her lawyers unilaterally to take from the board of directors the right to decide both whether the company has a claim and whether it is in the company's best interests to pursue such a claim. Delaware law leaves decisions about how a company will be managed, including decisions about if and when to initiate litigation, to the company's board of directors, not its shareholders.

As a result, a shareholder may bring a claim on behalf of a company only when the shareholder (1) makes a pre-suit demand on the board of directors requesting that the company bring claims on its own behalf, or (2) pleads specific facts showing that demand would be futile because a majority of the directors are subject to some material conflicting interest or lack of independence that would prevent them from impartially considering a demand. Here, plaintiff has met neither requirement.

The boilerplate reasons plaintiff gives for excusing her lack of demand are legally insufficient and fail to demonstrate that the Cephalon directors would not be able to consider a proper demand. All plaintiff offers in this regard are the conclusory allegations that: (1) the directors will not sue themselves; (2) the directors have financial interests that would be jeopardized by bringing the claims; and (3) the directors lack independence to consider a demand. These supposed "reasons" are situations faced by virtually every corporate director. Hence, they are the type of allegations that Delaware courts have repeatedly deemed inadequate to excuse demand. They simply will not overcome the presumption of Delaware law that directors will exercise their fiduciary duties in good faith to consider shareholder demands.

The requirement that plaintiff make a proper demand is all the more compelling here, where the Complaint is riddled with legal defects which the Company would want to — and should be permitted to — consider. For example:

- Plaintiff may lack standing to pursue any claims. The law requires any purported derivative plaintiff to have owned stock at the time of the alleged wrongdoing and throughout the course of the litigation. Here, although plaintiff claims she owned Cephalon stock at "all times relevant," the Company has no record of her ever owning any shares.

- The entire matter is plainly premature given that there has been no determination of any wrongdoing. The Connecticut Investigation is ongoing and no action has been commenced against Cephalon, nor has any fine, penalty or other liability been imposed.

- Plaintiff has not identified any cognizable harm to the Company, pleading only the most conclusory allegations of damage to goodwill and corporate image. Plaintiff alleges absolutely no facts and, therefore, these allegations are insufficient.

- The Complaint lacks any particularized facts to support any of its conclusory claims of wrongdoing by the defendants.

- To the extent plaintiff charges defendants with failure to monitor or oversee – a claim considered "possibly the most difficult" in corporate law – she alleges no facts, as she is obligated to do under the controlling law, to establish an "utter lack" of controls or a "conscious disregard" of the defendants' duties.

- As for the "constructive fraud" claim, plaintiff cannot establish, legally or logically, that the defendants failed to disclose information to Cephalon because any knowledge by the directors or officers would be imputed to the Company.

- The Complaint's conclusory allegations cannot establish the elements necessary for an unjust enrichment claim or the necessary scienter for insider trading claims.

These and other factors that go directly to the liability and damage issues undoubtedly would be considered by the Board upon proper demand.

Hence, as is discussed in detail below, this deeply-flawed Complaint should be dismissed in its entirety pursuant to Federal Rules of Civil Procedure 9(b), 12(c) and 23.1.

### Background[1]

**A.     The Parties**

Cephalon is a Delaware corporation with its principal place of business in Frazer, Pennsylvania that "engages in the discovery, development, and marketing of products in central nervous system disorders, pain, cancer, and addiction therapy areas." (Compl. ¶ 15.)

---

[1] Defendants dispute the allegations of the Complaint. While the factual allegations of the Complaint are taken as true for purposes of this motion, the Court need not "credit a complaint's 'bald assertions' or 'legal conclusions.'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

Defendant Frank Baldino, Jr., Ph.D., ("Baldino") is Cephalon's CEO and Chairman of the Board of Directors.  (Compl. ¶ 16.)  Defendant J. Kevin Buchi is CFO and an Executive Vice President of Cephalon.  (Compl. ¶ 17.)

Defendants William P. Egan, Martyn D. Greenacre, Gail R. Wilensky, Vaugh M. Kailian, Charles A. Sanders, Dennis L. Winger and Kevin E. Moley are all independent outside directors of Cephalon.  (Compl. ¶ 19.)

Of the eight Board members, only Dr. Baldino is a member of Company management.  No other Board member is alleged to have any relationship with the Company other than as a director.  These outside directors never held any positions at Cephalon, and the Complaint does not allege otherwise.  According to Cephalon's recent SEC filings, the defendants held the following numbers of Cephalon shares and/or options:  Baldino (377,329); Buchi (147,330); Egan (21,661); Greenacre (200); Wilensky (10,000); Sanders (10,000); Winger (10,000); Moley (16,000).  (*See* Cephalon, Inc., Form 4 and Form 3 filings.) (Exhibits A-J to the Declaration of Michael Newman ("Newman Decl."))[2]

According to the Complaint, plaintiff Catherine Krattenmaker is a citizen of New Jersey who was "at all times relevant" an owner of Cephalon stock.  (Compl. ¶ 14.)  However, as discussed *infra* p. 20, Cephalon's records show no indication that plaintiff owns Cephalon stock.

---

[2] In assessing the legal sufficiency of plaintiff's claims on a motion for judgment on the pleadings, the Court may take judicial notice of "documents integral to or explicitly relied upon in the Complaint; properly-authenticated public disclosure documents filed with the SEC; and stock prices and analyses reported by reputable financial service firms." *In re Ravisent Tech., Inc.*, No. Civ. A. 00-CV-1014, 2004 WL 1563024, at*1 n.1 (E.D. Pa. July 13, 2004) (citing *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002)).

**B.     Actiq**

1.     General Background

Actiq is a prescription drug used to treat "breakthrough cancer pain" -- one of the most challenging and debilitating components of cancer pain management.  Cephalon, Inc., Annual Report (Form 10-K), at 8 (February 28, 2007) (Exhibit K to the Newman Decl.).  The term "breakthrough pain" describes the onset of moderate to severe pain that "breaks through" the regular medication used by patients for persistent around-the-clock pain.  *Id.*  This type of pain develops quickly, reaches maximum intensity within three to five minutes, and lasts anywhere from minutes to several hours.  *Id.*  Those who suffer breakthrough pain can experience several episodes each day.  *Id.*  Medication with a rapid onset, which can be adjusted to the intensity and duration of the breakthrough pain, such as Actiq, is best-suited to treat this type of pain.  *Id.*

Actiq works by delivering fentanyl citrate, a powerful opioid analgesic, through the lining of the mouth.  *Id.* at 9.  This proprietary delivery system consists of a drug matrix attached to a handle, and allows the medication to enter the bloodstream rapidly and provide pain relief quickly, often within fifteen minutes.  *Id.* at 9.

The Food and Drug Administration approved Actiq in 1998 and Anesta Corp. launched it in the United States in 1999.  *Id.* at 9.  Cephalon acquired Anesta Corp. in August 2000 and relaunched Actiq in February 2001.  *Id.* at 9.

2.     Connecticut Investigation

In September 2004, the Connecticut Attorney General's office sent the Company a voluntary request for information that appeared to focus on sales and promotional practices

regarding Actiq and two other Cephalon drugs, Gabitril (for treatment of epileptic seizures) and Provigil (for narcolepsy, obstructive sleep apnea/hypopnea syndrome and shift work sleep disorder), including the extent of off-label prescribing of the drugs by physicians. *Id.* at 2. Cephalon promptly disclosed the Connecticut Investigation to investors, *see* Cephalon, Inc., Quarterly Report (Form 10-Q), at 28-30 (Nov. 9, 2004) (Exhibit L to the Newman Decl.), and reference to the Connecticut Investigation also was made in all subsequent Company filings. No government or regulatory action has been taken against Cephalon. Indeed, plaintiff's allegations appear to be based solely on opinions expressed in a recently published newspaper article.

## C.     The Complaint's Allegations

Plaintiff commenced this action in early January 2007, after the *Wall Street Journal* published an article on November 21, 2006 regarding the Connecticut Investigation of Actiq. The Complaint states, incorrectly, that the Connecticut Attorney General has "concluded" that "the defendants routinely caused Cephalon to engage in illegal and improper sales practices." (Compl. ¶ 2.) In fact, the investigation is ongoing and no conclusions have been reached. Moreover, the defendants, seven of whom are non-management directors, are never mentioned in the article and there is no suggestion that any of them "caused" anything improper or illegal. *See* John Carreyrou, *Cephalon Used Improper Tactics To Sell Drug, Probe Finds*, Wall St. J., Nov. 21, 2006, at B1 (Exhibit M to the Newman Decl.").[3]

---

[3] Plaintiff is also playing with the stock price numbers when she states that the stock price fell "from a high of $78.38 per share on November 20, 2006 to a close of $73.40 per share following the publication of the [Wall Street] Journal report on November 21, 2006." (Compl. ¶ 4.) While the stock did reach a high of $78.38 on the day preceding the publication of the *Wall Street Journal* article, it did not close at that price. Rather, the stock closed at $76.94 on November 20, 2006. Plaintiff's reference to the "approximate $5.00 per share decline in the price of Cephalon shares attributed to the report" is misplaced and incorrect. (Compl. ¶¶ 4, 31.)

The thrust of the allegations against the defendants are premised upon their alleged failure to oversee the marketing and sales of Actiq.  According to the Complaint, Cephalon's sales representatives encouraged "off-label" use of Actiq by promoting the drug to doctors other than oncologists and cancer pain specialists and by "touting" studies by doctors connected to the Company.  (Compl. ¶ 3.)  "Off-label" refers to the practice of prescribing a medication for a purpose other than that for which the FDA approved it.  While physicians are legally permitted to and, in their independent medical judgment, routinely do prescribe drugs for off-label use, drug companies may only promote the drug for its approved use.  Although the claims are based on a failure to monitor and oversee sales and marketing practices, the Complaint does not allege any specific facts to support this theory.  The entire Complaint rests on the invalid assumption that because the Company is being investigated, the defendants must have failed to properly monitor the Company.

The "illegal and improper acts and practices" plaintiff alleges are that "defendants published a series of materially false and misleading statements and managed the Company in a reckless and knowing manner, so as to deceive federal regulators and investors as to the performance, and financial health and well-being of the Company." (Compl. ¶ 39.)  The Complaint goes on to allege, in conclusory fashion, other acts purportedly committed by defendants to the detriment of plaintiff and investors, all of which would relate to a direct action for harm to shareholders, not a derivative action on behalf of Cephalon.  *See, e.g.*, Compl. ¶ 40 ("[M]aterial misrepresentations and omissions . . . caused or were a substantial contributing cause of the *damages sustained by plaintiff and other investors*." (emphasis added)); ¶¶ 32, 39b, 39d.

In fact, plaintiff identifies no cognizable harm to Cephalon. Her only real complaint is the drop in the stock price purportedly resulting from the publication of the *Wall Street Journal* article regarding the Connecticut Investigation, an investigation that had been disclosed by the Company more than two years before the article's publication. In any event, the alleged loss in market capitalization is a loss only to investors, not Cephalon. The only alleged harm to the Company is the conclusory claim of damage to image and goodwill, but there are no facts alleged to support this supposed form of damage.

## Argument

A motion for judgment on the pleadings under Rule 12(c) is treated in the same manner as a Rule 12(b)(6) motion to dismiss. *Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004). This standard requires the Court to accept the complaint's allegations as true, drawing all reasonable inferences in favor of plaintiff. *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 604 (3d Cir. 1998). However, the Court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" *In re Burlington Coat Factory Sec. Litig.* 114 F.3d 1410, 1429-30 (3d Cir. 1997). To survive a motion for judgment on the pleadings, "the plaintiff must set forth facts, and not mere conclusions, that state a claim as a matter of law." *Allstate Transp. Co., Inc. v. Southeastern Pa. Transp. Auth.*, Civ. A. No. 97-1482, 1998 U.S. Dist. LEXIS 1740, at *4 (E.D. Pa. Feb. 13, 1998).

Under the standard set forth above, this derivative Complaint should be dismissed on either of two grounds. First, plaintiff has failed to make the required pre-suit demand on Cephalon's Board and has failed to allege particularized facts demonstrating why demand should be excused. The Board is the appropriate body to determine whether there is a reason to pursue

this litigation on Cephalon's behalf.  Thus, at a minimum, the Court should dismiss the

Complaint and give the Board the opportunity to exercise its prerogatives as provided by

Delaware law. [4]  Second, even if the Court accepts the excuses plaintiff offers for her failure to

make demand, and it should not, the Complaint should still be dismissed because plaintiff has

not and cannot allege any set of facts on which she can prevail.

**I.      Plaintiff Failed To Make A Proper Demand On Cephalon's Board of
         Directors And Has Not Pled Adequately That Demand Would Have Been Futile**

**A.      The Board Of Directors Has The Right To Decide Whether To Initiate
         Litigation**

It is hornbook law that the "power to sue and be sued is one of the inherent

powers of a corporation, and is among the incidental or implied powers which have been

attributed to corporations from the earliest period."  1 William Meade Fletcher et al., *Fletcher*

*Cyclopedia of the Law of Private Corporations* § 4226.0 (perm. ed. rev. vol. 1999).  Indeed, as

early as the 1760s, *Blackstone's Commentaries* identified the power to sue and be sued as core

attributes of the corporation.  *Id.* at §5 (citing 1 *BL Comm.* 475).

Thus, the right to sue to redress injuries to the corporation belongs solely to the

corporation.  It is a "cardinal precept" of Delaware corporate law "that directors, rather than

shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d

---

[4] Federal Rule of Civil Procedure 23.1 requires that shareholder derivative complaints "allege with particularity the efforts . . . made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and . . . the reason for the plaintiff's failure to obtain the action or for not making the effort."  This creates a pleading requirement "which dictates when and how facts [relating to demand] must be alleged in federal court." *Amalgamated Bank v. Yost*, No. Civ. A. 04-0972, 2005 U.S. Dist. LEXIS 1280, *25 (E.D. Pa. Jan. 31, 2005).  Because the demand requirement of Rule 23.1 is purely procedural, *see Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96 (1991), federal courts must use substantive state law to analyze demand futility. *See Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir. 1992). Cephalon is a Delaware corporation.  Therefore Delaware substantive law governs the demand futility analysis.

805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253-54

(Del. 2000); *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 540 (1984) ("Whether or not a

corporation shall seek to enforce in the courts a cause of action for damages is, like other

business questions, ordinarily a matter of internal management and is left to the discretion of the

directors . . . .") (quoting *United Copper Sec. Co. v. Amalgamated Copper Co.*, 244 U.S. 261,

263 (1917)). As the Supreme Court has made clear, "the decisions of a corporation – including

the decision to initiate litigation – should be made by the board of directors or the majority of

shareholders." *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 101 (1991) (quoting *Daily

Income*, 464 U.S. at 530). Therefore, with regard to both pleading requirements as well as

substantive law, it will be a rare case where demand will be excused as futile and a shareholder

will be allowed to proceed with a derivative suit without first making demand on the board of

directors. *Rales v. Blasband*, 634 A.2d 927, 930, 934 (Del. 1993).

**B.    Demand Is Not Excused Unless Plaintiff Shows Demand Would Be Futile**

        In a derivative suit not challenging specific board action, such as the one plaintiff

purportedly seeks to bring, "demand should not be excused . . . in the absence of allegations

demonstrating why the board is incapable of considering a demand." *Rales*, 634 A.2d at 934 n.9.

A plaintiff pleading demand futility faces a high burden that is met only when "particularized

factual allegations . . . create a reasonable doubt that, as of the time the complaint is filed, the

board of directors could have properly exercised its independent and disinterested business

judgment in responding to a demand." *Id.* at 934; *Stone v. Ritter*, 911 A.2d 362, 367 n.9 (Del.

2006) (citing *Brehm*, 746 A.2d at 254); *see also Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del.

Ch. 1995) (applying *Rales* test where plaintiffs alleged director defendants failed to supervise

11

statements made by the company and its officers).  Allegations based upon "mere suspicions or stated solely in conclusory terms" will not suffice.  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled on other grounds by Brehm*, 746 A.2d at 253-54.  Thus, plaintiff here must put forth *specific facts* that a *majority* of the Cephalon Board of Directors would be "materially affected, either to [their] benefit or detriment, by a decision of the board [to pursue the claims], in a manner not shared by the corporation and the stockholders," *Seminaris*, 662 A.2d at 1354, or so "beholden" to a dominating force or "so under [the dominating force's] influence that their discretion would be sterilized," *Rales*, 634 A.2d at 936.

### C.    Plaintiff Has Not Pled Particularized Facts Showing How The Directors Are "Beholden"

A director is "independent" when he or she is able to base a decision on "'the corporate merits of the subject before the board rather than extraneous considerations or influences.'"  *Seminaris*, 662 A.2 at 1354 (quoting *Aronson*, 473 A.2d at 816).  Plaintiff contends that the members of the Board of Directors cannot exercise independent judgment based on (1) the conclusory assertion that all board members are "controlled" and "dominated" by Dr. Baldino, the CEO and Chairman of the Board, (2) the conclusory assertion that Greenacre, Kailian and Baldino have "entangling" personal and business relationships and (3) the conclusory assertion that Kevin Moley is "beholden" to other (unnamed) directors for his board position.  None of these allegations, however, offer anything beyond bald assertions to cast doubt on any Board member's independence, *much less that the requisite majority of the Board cannot act independently.*

12

### 1.    Domination And Control

Plaintiff alleges that all the Board members are incapable of exercising independent judgment "because defendant Baldino is the Chairman of the Board of Directors and Chief Executive Officer of Cephalon that dominated and controlled the Company during the relevant period, and who continues to dominate and control the Company as a result of his joint roles as the senior most executive officer and leading Board member of the Company." (Compl. ¶ 51a.) The Complaint offers nothing else to support the theory that Dr. Baldino "dominated and controlled" the Board. It cannot be, however, that Dr. Baldino's position as CEO and Chairman *ipso facto* renders the remaining Board members dependent. If that were the case, then no public company would ever have an independent board because all corporations have a chief executive officer and chairman of the board.

Plaintiff has utterly failed to show, as she must, that these directors would succumb to the control of Dr. Baldino and improperly refuse the demand had one been made. As the Delaware Supreme Court previously held:

> [I]n the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting "a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling." The shorthand shibboleth of "dominated and controlled directors" is insufficient.

*Aronson*, 473 A.2d at 816 (internal citations omitted). Accordingly, plaintiff's unsupported conclusion that Dr. Baldino "dominated and controlled" the entire Cephalon Board fails to excuse demand.

### 2.    Relationships

Plaintiff implies that the existing friendships and business relationships among defendants Baldino, Greenacre, and Kailian render them incapable of exercising independent judgment. Plaintiff states that these directors have "longstanding personal and financial relationships that extend well beyond their participation on the Board of Directors." (Compl. ¶ 51b.) The only "fact" of these "entangling" relationships put forth is that Dr. Baldino serves on the board of Acusphere with Mr. Greenacre and on the board of NicOx, S.A. with Mr. Kailian. (*Id.*) The Complaint is silent on what personal or financial relationships these or any of the other directors have with each other. Moreover, plaintiff fails to explain how such relationships destroy these directors' independence or would disable their judgment with respect to a demand in this case. *See Beam v. Stewart*, 845 A.2d 1040, 1049-50 (Del. 2004) (When a court questions the independence of directors, it must ask "independent from whom and independent for what purpose?").

Indeed, nowhere in the complaint does Plaintiff allege, as she must, how these friendships and business relationships overcome the presumption of faithfulness that defendants Baldino, Greenacre, and Kailian possess as directors. *Id.* at 1048-49 ("[D]irectors are entitled to a presumption that they were faithful to their fiduciary duties . . . [and] the burden is on the plaintiff in a derivative action to overcome that presumption."). Under Delaware law, "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Id.* at 1050; *see also Litt v. Wycoff*, C.A. No. 19083-NC, 2003 Del. Ch. LEXIS 23, at *16 (Del. Ch. March 28, 2003). Thus, the conclusory assertions identifying the defendants' friendships and business

14

relationships fail to establish any reasonable doubt as to the independence of defendants Greenacre, Kailian, or Baldino.

Moreover, even if there were sufficient doubt, which there is not, the allegations that three of the directors lack independence fail to establish that the remaining five directors, who constitute a majority of the Board, lack independence. Once again, the conclusory nature of these allegations does not come even remotely close to satisfying the burden placed on plaintiff by Delaware law.

### 3.    Board Appointment

Finally, plaintiff asserts that Kevin Moley, who was appointed to the Board on May 17, 2006, is not independent because he "is beholden to the other members of the Cephalon Board for his recent re-appointment." (Compl. ¶ 51c.) Plaintiff elaborates no further on Mr. Moley's alleged dependence. For instance, she does not state who appointed him or how this "recent re-appointment" affects Mr. Moley's independence. Instead, plaintiff rests on the inference that because Mr. Moley was appointed by his fellow Board members, he is beholden to them. This conclusory assertion fails as a matter of law.

If mere appointment or nomination to a board were sufficient to destroy a director's independence, then nearly every board member would lack independence, as he or she was likely appointed or nominated by another member. Regardless, "the law is well-settled that [a controlling director's] involvement in selecting each of the directors is insufficient to create a reasonable doubt about their independence." *White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000); *Beam*, 845 A.2d at 1054 (holding that appointment of director by board chairman did not create reasonable doubt of director's independence). Thus, a mere assertion that Mr. Moley's

15

appointment somehow affects his independence is insufficient to excuse demand.  Again, even if

the appointment somehow made Mr. Moley beholden to the other directors, plaintiff fails to

show how this would affect the independence of the rest of the directors.[5]

### D.    Plaintiff Has Not Pled Any Facts Showing That A Majority Of The Board Of Directors Are "Interested"

Plaintiff once again alleges in conclusory fashion that demand should be excused

because the directors received financial benefits that would be at risk if Cephalon pursued the

claims alleged by plaintiff.  The supposedly suspect "benefits" consist of "salaries, bonuses,

payments, benefits and other emoluments" received "by virtue of [the defendants'] membership

on the Board and their control of Cephalon" (Compl. ¶ 50e) – in short, the usual financial

incentives offered to secure qualified directors and officers.  This argument fails as a matter of

law.  If such typical compensation for board service constituted a disabling conflict, then

virtually every director of every corporation would be disqualified from evaluating a demand,

rendering the demand requirement meaningless.  Nowhere does plaintiff state that these benefits

were anything other than ordinary and usual compensation.  Indeed, plaintiff concedes that the

benefits were earned "*by virtue* of their membership on the Board." (Compl. ¶ 50e (emphasis

added).)  Moreover, plaintiff fails to state how these benefits influenced any defendant's

decision-making ability and rendered the directors interested, either in general or with respect to

a demand by plaintiff.

---

[5] If Mr. Moley did lack independence with respect to plaintiff's demand, the simple solution would be for him to recuse himself, not to revoke the fundamental right of the Company to control litigation.

### 1.    Compensation Does Not Amount To "Interest"

Delaware courts recognize that a director is not legally "interested" in a corporate decision by virtue of being compensated for serving on the board. *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988) (holding that allegations that directors are paid for their services, "without more, do not establish any financial interest"), *overruled on other grounds by Brehm*, 746 A.2d at 253-54. The reason behind this rule is simple: "courts have clearly held that allegations of directors receiving the common perquisites given to a board of directors [are] not sufficient to show self-dealing, because if this were sufficient, all boards would be self-interested." *Poland v. Caldwell*, Nos. 89-645, 89-1255, 1990 WL 158479, at *4 (E.D. Pa. Oct. 12, 1990). This also holds true for compensation to inside directors, such as Dr. Baldino, the only management director. *Beam v. Stewart*, 833 A.2d 961, 978 n.55 (Del. Ch. 2003) (allegations regarding inside director's compensation did "not call into question [the director's] *disinterest* with respect to demand" (emphasis in original)). Accordingly, the plaintiff has failed to plead a disabling financial interest.[6]

### 2.    Naming Directors As Defendants Does Not Create "Interest"

Plaintiff also attempts to create a disabling conflict of interest by alleging unsubstantiated wrongs against all the directors and singing the "discredited refrain" that the directors will not sue themselves to excuse her failure to make a demand on the Board. *Brehm*, 746 A.2d at 257 n.34 ("It is no answer to say that demand is necessarily futile because (a) the directors 'would have to sue themselves' . . . or (b) that they approved the underlying

---

[6] In fact, the defendants' significant stock positions in the Company, *supra* p. 5, would align their interests with those of the shareholders, including plaintiff.

transaction."). Such an attempt must necessarily fail. As the Delaware Chancery Court has

stated:

> [i]t is well established that the simple expedient of naming a
> majority of otherwise disinterested and well motivated directors as
> defendants and charging them with laxity or conspiracy, etc., will
> not itself satisfy the standards for permitting a shareholder to be
> excused from demand or to override a board decision not to litigate
> a corporate claim.

*Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1055 (Del. Ch. 1996) (citing *Aronson*, 473

A.2d at 815). If "bootstrap allegations of futility, based on claims of directorial participation in

and liability for the wrongs alleged, coupled with a reluctance by directors to sue themselves"

were enough to establish director interest, demand would be excused in every case. *Pogostin v.*

*Rice*, 480 A.2d 619, 625 (Del. 1984), *overruled on other grounds by Brehm*, 746, A.2d at 253-

54. That, however, is not the law. *Jacobs v. Yang*, C.A. No. 206-N, 2004 Del. Ch. LEXIS 117,

at *25 n.31 (Del. Ch. Aug. 2, 2004) (Demand is not futile "merely because directors would be

suing themselves. . . . To so hold would eviscerate the demand requirement of Rule 23.1.").

### 3.    Plaintiff's Allegations Fail To Establish Substantial Likelihood Of Liability

Finally, plaintiff's claims against the directors fail to create any substantial

likelihood of liability. Plaintiffs must provide specific facts – not simply conclusory allegations

– to establish liability. *Brehm*, 746 A.2d at 254 ("A prolix complaint larded with conclusory

language . . . does not comply with these fundamental pleading mandates."); *Grobow*, 539 A.2d

at 187 n.6 ("[N]either inferences nor conclusions of fact unsupported by allegations of specific

facts upon which the inferences or conclusions rest are accepted as true."); *Guttman v. Huang*,

823 A.2d 492, 499 (Del. Ch. 2003) ("Mere notice pleading is insufficient to meet the plaintiffs'

burden to show demand excusal in a derivative case."). The "mere threat" of liability will not meet the standard of substantial likelihood of success. *Seminaris*, 662 A.2d at 1354. Rather, defendants' actions must be "so egregious that a substantial likelihood of director liability exists." *Id*. As is explained below, the Complaint is infected with legal defects. Thus, far from establishing a substantial likelihood of liability, the Complaint must be dismissed for failure to state a claim upon which relief could be granted.

*    *    *    *    *

In summary, the Complaint's allegations of demand futility fail to meet the rigorous standards of Delaware corporate law. Accordingly, demand was not excused and the Complaint must be dismissed for that reason. The Cephalon Board is independent and disinterested and, therefore, under Delaware law, is the proper body to consider demand.

## II. The Complaint Is Rife With Legal And Factual Defects That The Board Should Be Permitted To Consider Upon Proper Demand

Enforcement of the demand requirement is all the more compelling where, as here, the Complaint is facially defective. If demand had been made, as Delaware law mandates, the Board would have been able to consider these defects in evaluating whether the claims had merit and whether to initiate a lawsuit on the Company's behalf. It is not surprising that the Complaint is sparse, both factually and legally. Put simply, no one has done anything wrong and plaintiff cannot say otherwise. The numerous defects highlight this fact, as well as the important role the demand requirement plays in corporate governance.

Pre-suit demand is more than just a technical pleading requirement. Rather, demand is a "rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation and to control any litigation which does arise." *Aronson*, 473

19

A.2d at 811-12.  A motion to dismiss which challenges whether plaintiff has sufficiently pled

demand futility, "is not intended to test the legal sufficiency of the plaintiff's substantive claim

. . . [but] to determine who is entitled, as between the corporation and its shareholders, to assert

the . . . claim on the corporation's behalf." *Levine v. Smith*, Civ. A. No. 8833, 1989 WL 150784,

at *5 (Del. Ch. Nov. 27, 1989) *aff'd* 591 A.2d 194 (Del. 1991).  Through her actions, plaintiff

has denied Cephalon and its Board a "cardinal precept" of Delaware law – the right to manage

the corporation. *Aronson*, 473 A.2d at 811.

### A.     The Board Should Be Permitted To Consider The Numerous Threshold Defects Of The Complaint

#### 1.     Lack Of Standing

As a threshold matter, it is not clear that plaintiff has standing to bring any claims

against Cephalon or any of its directors and officers, or on behalf of Cephalon for harm allegedly

incurred by Cephalon at the hands of the defendants.  The Complaint states that plaintiff is a

Cephalon shareholder, (Compl. ¶ 14), but the Company has no record of her ever owning shares

in her name.  In order to have standing to assert a derivative suit, a plaintiff must have been a

stockholder at the time of the alleged wrongful conduct and at the time the lawsuit was

commenced, and must remain a stockholder throughout the litigation. *See, e.g., Kramer v.

Western Pacific Indus., Inc.* 546 A.2d 348, 354 (Del. 1988); *Lewis v. Anderson*, 477 A.2d 1040,

1046 (Del. 1984).  Plaintiff may not be able to satisfy this fundamental prerequisite.

#### 2.     Failure To Define Temporal Scope

Plaintiff repeatedly refers to the "relevant period" in her Complaint, but nowhere

does she define the term.  This is a significant deficiency for a host of reasons.  To the extent

plaintiff may have been a shareholder at some point, she must have been a shareholder during the

entire "relevant period."  Moreover, such imprecision does not permit the defendants to determine when the alleged wrongdoing occurred, thereby limiting their ability to investigate the matters alleged or to be on notice of the charges against them.  Also, not all of the defendant directors have served on the board during the time Actiq has been a Cephalon product.  For instance, Mr. Moley rejoined the board in May 2006.  (Compl. ¶ 51c.)  Without a specific time period during which the purported wrongful conduct allegedly occurred, it is not clear that Mr. Moley is an appropriate defendant (to the extent that there are any appropriate defendants).

### 3.      Failure To Allege Injury To The Corporation

Plaintiff has not established that Cephalon suffered any cognizable harm.  It goes without saying that a shareholder may not seek redress for harm done to a corporation when no harm has occurred.  *Citron v. Merritt-Chapman & Scott Corp.*, 409 A.2d 607, 611 (Del. Ch. 1977), *aff'd*, 407 A.2d 1040 (Del. 1979) ("[T]he complaint brought on behalf of the corporation alleges no damage to the corporation and no profit by the individual defendants at the expense of the corporation. . . . As such, I fail to see where a viable cause of action is alleged.").

Even if, for argument's sake, plaintiff's muddled allegations were true – that the defendants caused the Company to increase its sales through improper sales and marketing – Cephalon would have in fact *benefited* from these actions.  For example, the Complaint alleges that defendants "encourag[ed] doctors to over-proscribe [sic] the drug . . . ."  (Compl. ¶ 5b.) Taken at face value, this means that more prescriptions of Actiq would have been written, thus, more sales would have occurred.  More sales would mean more revenue for the Company.  Also, the Complaint states that "more than 80% of Actiq's sales are made to non-cancer patients."

(Compl. ¶ 39c.)  Again, this suggests increased sales of the product and better financial results for Cephalon.

Plaintiff refers to Cephalon's "badly damaged . . . corporate image and goodwill," but provides no substantive description of how Cephalon's image and goodwill have been damaged or how that damage, if it exists, translates into tangible harm.  (Compl. ¶ 7.)  *In re Cray Inc. Derivative Litig.*, 431 F. Supp. 2d 1114, 1134 (D. Wash. 2006) ("[L]ost goodwill and business reputation damage allegations must be more than speculative and conclusory.");  *Dollens v. Zionts*, No. 01 C 2826, 2002 U.S. Dist. LEXIS 13511, *28 (N.D. Ill. July 22, 2002).  Plaintiff mentions a "liar's discount" that will impair Cephalon's "ability to raise equity capital on favorable terms in the future," (Compl. ¶ 7), but identifies no instance where this has actually occurred.  *In re United Telecomms., Sec. Litig.*, No. 90-2251-EEO, 1993 U.S. Dist. LEXIS 4749, *8 (D. Kan. March 4, 1993) (dismissing claim that alleged only conclusory allegations of injury to corporation's credibility and ability to conduct business); *In re Symbol Techs. Sec. Litig.*, 762 F. Supp. 510, 517 (E.D.N.Y. 1991) (same).  This prospective, uncertain and unsubstantiated "harm" cannot establish any real present injury to Cephalon.  Absent harm, there is no claim.  *Citron*, 409 A.2d at 611.

### 4.      Prematurity

To be certain, this action, if anything, is woefully premature.  As described above, Cephalon has suffered no harm resulting from the acts alleged in the Complaint.  The Complaint does not allege that any actions, either civil or criminal, have been instituted by any government agency.  Despite plaintiff's averments to the contrary, no government agency has reached any conclusions regarding Cephalon's sales and marketing.  Moreover, there are no facts to suggest

that any of the defendants participated in any wrongs that may possibly have occurred or that the

defendants ever had any indication that there might be any problems.  In sum, there is simply no

harm to be redressed.  *Id.*

### 5.    Claim Is Not Really Derivative

At best, plaintiff's Complaint seeks redress for securities violations.  Indeed, as

described above in greater detail, *supra* pp. 2, 8-9, the Complaint reads as a direct securities

fraud claim.  All the allegations and all the harm described in the Complaint are directed to

shareholders and the harm they allegedly have suffered.  Thus, to the extent that this is really a

complaint about disclosures to shareholders and not about wrongs committed against the

Company, the Board, if given the opportunity, would have considered this and determined that

any suit would lie properly as a direct claim by shareholders and not as a derivative complaint

based on misguided and improper claims.

### B.    The Board Should Be Permitted To Consider The Substantive Failings Of The Claims

Beyond the threshold defects enumerated above, the substantive claims are also

fatally flawed.  Plaintiff's Complaint contains only conclusory allegations for one simple reason:

there are no facts giving rise to any claims.  Plaintiff has not and, indeed, cannot, put forth any

facts upon which she could prevail and her Complaint should be dismissed for this independent

reason.

### 1.    Failure To Exercise Oversight

In Count I of the Complaint, plaintiff alleges breach of fiduciary duty against the

individual defendants.  Plaintiff appears to base the claim on the defendants' alleged failure to

exercise proper oversight of the Company.[7]  This claim, often referred to as a *"Caremark* claim," has been described by Delaware courts as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Derivative Litig.,* 698 A.2d 959, 967 (Del. Ch. 1996).  Indeed, "where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability." *Guttman,* 823 A.2d at 506 (quoting *Caremark,* 698 A.2d at 971).  A "conscious disregard for their responsibilities" is a necessary prerequisite for director liability under *Caremark. Stone,* 911 A.2d at 370 (dismissing a purported *Caremark* claim).

      The standard for bringing a *Caremark* claim is intentionally high, as the Delaware Supreme Court recently stated. *Id.* at 372.  A high liability standard protects shareholders because it encourages board service by qualified individuals. *Id.* (quoting *Caremark,* 698 A.2d at 971).  At the same time, it "acts as a stimulus to *good faith performance of duty* by such directors." *Id.* (emphasis in original).

### a.  No Tangible Harm Can Be Alleged Here

      In general, a hallmark of a purported *Caremark* claim is a pre-existing tangible financial harm to the corporation. *See, e.g., Stone,* 911 A.2d at 366 (Del. 2006) ($50 million in

---

[7] Delaware does not recognize "abuse of control" and "gross mismanagement" (Counts II and III of plaintiff's Complaint) as independent torts.  Instead, they are elements of duty of care claims. *Clark v. Lacy,* 376 F.3d 682, 686 (7th Cir. 2004) ("[A]dditional claim[s] [of] abuse of control [and] gross mismanagement . . . [are] premised on the defendant's alleged breach of their fiduciary duties."); *Stone,* 911 A.2d at 369 (holding that gross negligence is an example of the fiduciary duty of care).

civil fines and penalties for violating Bank Secrecy Act); *David B. Shaev Profit Sharing Account v. Armstrong*, C.A. No. 1449-N, 2006 Del. Ch. LEXIS 33, *9-10 (Del. Ch. Feb. 13, 2006) ($5 billion in penalties and litigation settlement costs); *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 801 (7th Cir. 2003) ($100 million FDA penalty). But, a *Caremark* claim requires much more than just a fact of monetary loss or harm. *Stone*, 911 A.2d at 371. There must be specific allegations of bad faith conduct on the part of directors, such as an intentional failure "to act in the face of a known duty to act, demonstrating a *conscious disregard* for [the directors'] duties." *Id.* at 370 (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006)) (emphasis added). For example, a plaintiff should plead factual allegations showing the directors knew there were problems and nonetheless ignored them. *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2 1268, 1270-71 (Del. Ch. 1995) ("Plaintiff has not pled with particularity that the directors ignored obvious danger signs of employee wrongdoing.") (citing *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963)); *David B. Shaev*, 2006 Del. Ch. LEXIS 33, at *14-16 (discussing need to plead "red flags" that the directors ignored); *Guttman*, 823 A.2d at 507 n.36 (same).

Even if the plaintiff were able to allege in the Complaint that there was a fine, penalty or other financial impact, that alone would not suffice to establish directorial bad faith. *Stone*, 911 A.2d at 373 (disapproving plaintiffs' attempt "to equate a bad outcome with bad faith"). As the Delaware Supreme Court has noted in dismissing a *Caremark* claim, "in the absence of red flags, good faith in the context of oversight must be measured by the directors' actions 'to assure a reasonable information and reporting system exists' and not by second guessing after the occurrence of employee conduct that results in an unintended adverse

25

outcome." *Id.* (quoting *Caremark*, 698 A.2d at 967-68, 971). Indeed, "'neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's behalf.'" *Id.* at 368 (quoting *Caremark*, 698 A.2d at 969).

### b.   Plaintiff Cannot Show That Defendants' Conduct Was Intentional And Egregious

Plaintiff's burden to establish defendants' liability is even higher in the present case because Cephalon's shareholders have adopted, pursuant to Delaware law, a provision in the Company's certificate of incorporation that protects the directors from liability for money damages resulting from breach of certain fiduciary duties.[8]  8 Del. C. § 102(b)(7); Article Sixth, Restated Certificate of Incorporation of Cephalon, Inc. (Exhibit N to Newman Decl.).[9]  This provision immunizes the directors for gross negligence and reckless or negligent breach of the duty of care.  Therefore, any claims for non-intentional conduct must be dismissed.  *Baxter*, 654 A.2d at 1270 (holding no substantial likelihood of success because section 102(b)(7) would protect directors from liability for failure to prevent pharmaceutical sales representatives from making misrepresentations).

---

[8] The Court can take judicial notice of a corporation's certificate of incorporation when reviewing a motion to dismiss. *Amalgamated Bank v. Yost*, No. Civ. A. 04-0972, 2005 U.S. Dist LEXIS 1280, at *16 (E.D. Pa. Jan. 31, 2005).

[9] The Article states, in relevant part:

> A Director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director, except for liability (i) for any breach of the Director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the Director derived any improper personal benefit.

Here, to establish a substantial likelihood of director liability sufficient to excuse demand, plaintiff must plead particularized facts demonstrating that "(a) the directors utterly failed to implement any information or reporting system, *or* (b), having implemented such controls," the directors knowingly and intentionally ignored problems and risks. *Stone*, 911 A.2d at 370 (emphasis in original). Given this stringent standard, Delaware courts have stated that it is "a rare case where the circumstances are so egregious that there is a substantial likelihood of liability" for a duty of care claim based on failure to exercise oversight. *Baxter*, 654 A.2d at 1271 (citing *Aronson*, 473 A.2d at 815). This is not such a case.

In a case similar in certain respects to the one here, this Court, in an opinion by Judge Yohn, dismissed the plaintiff's complaint for failure to make demand because, *inter alia*, plaintiff failed to show that the directors' conduct would likely result in liability. *Amalgamated Bank v. Yost*, No. Civ. A. 04-0972, 2005 U.S. Dist LEXIS 1280 (E.D. Pa. Jan. 31, 2005). The lawsuit was brought after an article appeared in the *Wall Street Journal* reporting that the FBI and the FDA were investigating the company regarding its involvement in a scheme to collect multiple rebates on drug shipments. *Id.* at *6. The court held that plaintiff could not show the necessary "lack of good faith" because, unlike the case relied upon by the *Amalgamated* plaintiff involving the largest fine ever imposed by the FDA, "[the corporation's] conduct has not resulted in government action or fines." *Id.* at *37. Here, there can likewise be no finding of bad faith because there has been no finding of misconduct by Cephalon, much less one resulting in government action or fines or any other form of tangible loss. *Id.*

Beyond the failure to allege government actions, the Complaint also fails to plead the particularized facts establishing that the defendants failed to implement controls or monitor

27

existing controls.  The Complaint simply, and inadequately, states the conclusion that defendants

failed to "maintain adequate internal operational controls and procedures," (Compl. ¶¶ 5b-c, 35),

and to "supervise the marketing and sales" of Actiq, (Compl. ¶ 1).  It says nothing to suggest that

the directors were aware of any problems regarding marketing and sales, if there even were any,

or that the directors *purposely* ignored any warnings they may have had.  Though the Complaint

repeats the allegations that defendants acted intentionally, this repetition does not make up for

the absence of any *facts* supporting the allegations.  In fact, the Complaint says nothing about the

defendants' conduct other than stating that the defendants were directors or officers at the time of

the alleged wrongdoing.  It does not indicate what any individual defendants actually did or did

not do.  In short, the Complaint fails to state a *Caremark* claim.

### 2.    Constructive Fraud

In Count IV of the Complaint, plaintiff purports to bring a claim for "constructive

fraud."  This is one of the more perplexing claims in what is already a labyrinthine complaint.

Though labeled "constructive fraud," the substantive paragraphs of the claim speak only of the

"duty of candor," (Compl. ¶¶ 71-72), which is a duty of care claim, *Malpiede v. Townson*, 780

A.2d 1075, 1086 (Del. 2001).

The "split personality" of this claim is not limited to the label; plaintiff makes two

entirely different allegations in what is meant to be the substance of this one claim.  First,

plaintiff alleges that the directors misled Cephalon.  (Compl. ¶ 71.)  But, in the next breath, she

says the directors misled the shareholders.  (Compl. ¶¶ 71-72.)  To the extent that plaintiff

alleges the directors misled the shareholders, that is a different claim from the derivative claim

brought to redress harm to Cephalon.  More problematic, however, is the allegation that the

directors could somehow mislead the corporation. A corporation knows what its officers and directors know. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207, 212 (Del. Ch. 2006) (holding that a corporation cannot be deceived by the allegedly fraudulent statements of its controllers). Thus, how can Cephalon not know what the Board knows and somehow be deceived or misled? This is tantamount to saying Cephalon deceived itself. Such a claim cannot be maintained. *Id.* (holding complaint failed to state fraud claim where claim alleged that board knew facts it concealed from company).

To the extent that the claim is one for the breach of the duty of disclosure (the term preferred by the Delaware Supreme Court, *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)), it is misplaced here. A putative disclosure claim arises where the board seeks shareholder approval, such as the vote on a proposed merger. *Id.* ("[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."). Nonetheless, to bring a claim for a breach of the duty of disclosure, the plaintiff must identify missing facts that would be material to a shareholder. *Malpiede v. Townson*, 780 A.2d 1075, 1086-87 (Del. 2001) (citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 (Del. 1997)). Inherent in that formulation is the requirement that plaintiff identify particular missing facts and explain how their omission caused harm. *Id.* Plaintiff does not indicate what specific information the directors failed to disclose, only that the defendants "concealed material facts." (Compl. ¶ 72.) She does not state what these facts are or how they are material. This failure, among the many others, dooms the claim. Finally, even if plaintiff had pled a proper claim, the exculpatory clause of the certificate of incorporation would shield defendants from money damages for this claim. 8 Del. C. §

102(b)(7). *Arnold v. Society for Sav. Bancorp.*, 650 A.2d 1270, 1287 (Del. 1994). Thus, plaintiff has not stated a claim for either constructive fraud[10] or for disclosure violations.

### 3. Unjust Enrichment

In Count IV, plaintiff seeks to bring a claim for unjust enrichment. Plaintiff bases this claim on the unsupported allegation that defendants were "unjustly enriched" from "illegal insider stock sales, unjustified salaries, benefits, bonuses, stock options and grants and other emoluments of office, as well as illegal insider stock sales [sic]." (Compl. ¶ 75.) Plaintiff's claim for unjust enrichment, like the preceding claims, lacks particularized facts, and fares no better.

Indeed, plaintiff cannot establish the basic elements of a claim for unjust enrichment, specifically, that any "enrichment" was "unjustly earned" by a director at the expense of Cephalon. *Shock v. Nash*, 732 A.2d 217, 232 (Del. 1999) ("Unjust enrichment is . . . 'the unjust retention of a benefit to the loss of another, or the retention of money or property against the fundamental principles of justice or equity and good conscience.'") (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)). To plead a claim of unjust enrichment, a party must allege "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law." *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999)

---

[10] As the Complaint sounds in fraud, it is subject to the heightened pleading requirements of F.R.C.P. 9(b) which requires a plaintiff to plead fraud with particularity. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006); *Johnson v. Heimbach*, CIVIL ACTION No. 03-2483, 2003 U.S. Dist. LEXIS 22194, at *10 (E.D. Pa. Nov. 25, 2003) (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). It does not provide the necessary facts and detail, as it must, demonstrating the circumstances of the fraudulent conduct sufficient to put defendants on notice of the specific misconduct with which they are charged. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996); *Suprema Specialties*, 438 F.3d at 270. Thus, the Complaint is plainly deficient under F.R.C.P. 9(b).

(quoting *Nufarm v. RAM Research*, C.A. No. 16179, 1998 Del. Ch. LEXIS 182 (Del. Ch. Sept. 15, 1998)).  This the plaintiff cannot and does not do.

**a.    Defendants Were Entitled To Receive Salaries And Bonuses**

Plaintiff fails to identify any benefit the directors were not entitled to receive and retain.  The litany of benefits plaintiff identifies, including salaries and stock options, are legitimate compensation for the defendants' service on the Board and to the Company. *Amalgamated*, 2005 U.S. Dist LEXIS 1280 at *40.  Significantly, plaintiff does not say what the defendants received in salary, bonus, options and other "emoluments," how these benefits are unjust or that there was no consideration provided in exchange for them.  To say, as plaintiff does, that the Company received *no* benefit for the defendants' service is preposterous.  (Compl. ¶ 76.)  To be certain, "even where a corporate fiduciary's breach of the duty of loyalty results in his being stripped of all profit flowing from the breach, [the fiduciary may retain] an amount that represents reasonable compensation . . . for services legitimately performed." *Technicorp Int'l II, Inc., v. Johnson*, No. Civ. A. 15084, 2000 WL 713750, at *53 (Del. Ch. May 31, 2000). Similarly, plaintiff fails to identify any loss that Cephalon supposedly sustained as a result of some "enrichment." *See* Compl. ¶¶ 75-77 (stating only that defendants were enriched "at the expense of Cephalon").  These deficiencies and errors are fatal to plaintiff's unjust enrichment claim.

**b.    Allegations Of Insider Trading Are Merely Conclusory and Lack Any Showing Of Scienter**

The allegation that the defendants engaged in "illegal insider trading" is patently defective.  First, plaintiff offers nothing more than the fact of stock sales as "evidence" of "improper" sales.  Compl. ¶ 36; *Guttman*, 823 A.2d at 502 ("It is unwise to formulate a common

31

law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information."). Significantly, even though plaintiff brings this claim against all defendants, plaintiff's list of twenty allegedly improper sales includes only four transactions by the named defendants. (Compl. ¶ 36.)

Moreover, these allegations necessarily fail because insiders are generally "free to trade in the market place in [the] company's stock." *Rosenberg v. Oolie*, Civ. A. No. 11,134, 1989 WL 122084, at *4 (Del. Ch. Oct. 16, 1989). Trading by company insiders becomes a problem only when the trades occur *because of* confidential non-public information. Indeed, to state a claim and establish liability, the plaintiff must show: "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd* 2005 Del. LEXIS 150 (Del. April 14, 2005).

Thus, scienter is a necessary element of insider trading under Delaware law. *Guttman*, 823 A.2d at 505 ("[I]nsider trading claims depend importantly on proof that the selling defendants acted with scienter."); *Amalgamated*, 2005 U.S. Dist LEXIS 1280 at *43. To establish scienter, plaintiff must show a suspicious trading pattern in addition to stating what nonpublic information defendants possessed. *Amalgamated*, 2005 U.S. Dist LEXIS 1280 at *11. For example, plaintiff would have to plead information regarding prior stock sales and how the questioned trades differed from those. *Guttman*, 823 A.2d at 504. Moreover, plaintiff would have to plead information regarding the defendants' total stock holdings in the Company to

"show[] that defendants' trades were suspicious given their total holdings." *Amalgamated*, 2005 U.S. Dist LEXIS 1280 at *11.

The Complaint here does not specify what inside information any of the selling directors possessed or that the trades were made on the basis of that information. In addition, and notably, all the sales identified by plaintiff occurred well after the fact of the Connecticut Investigation had been disclosed and well before the *Wall Street Journal* article was published. *Guttman*, 823 A.2d at 498 (insider selling claim inadequately pled due to failure "to allege particularized facts that support a rational inference that [defendants] possessed information about [corporation's] actual performance that was materially different than existed in the marketplace at the time they traded, much less that they consciously acted to exploit such superior knowledge"). Finally, plaintiff fails to allege a single fact showing how defendants' trades were inconsistent with past trades or how they compared with defendants' total holdings of Cephalon stock.

These examples of defects emphasize why pre-suit demand is not just a legal technicality that can or should be easily waived or excused. The shortcomings of this Complaint are considerations the Board should be allowed to entertain in evaluating whether to initiate a lawsuit. Plaintiff unilaterally usurped the Board's fundamental right to control litigation and, in the process, imposed significant costs upon the Company and its shareholders. Plaintiff should not be rewarded for thwarting the law in this manner. The claims should be dismissed for failure to abide by the law and make an appropriate demand upon the Board. The Cephalon Board of Directors, not plaintiff, or even this Court, should have determined, in the first instance, whether the claims should go forward.

## Conclusion

For the reasons stated above, the Court should grant Defendants' Motion for

Judgment on the Pleadings and dismiss the Complaint in its entirety with prejudice.

Dated: Philadelphia, PA
      March 7, 2007

Respectfully submitted,


/s/ MLK6620

Steven B. Feirson
Michael L. Kichline
Michael J. Newman
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
215.994.4000

*Attorneys for the Defendants*
*Frank Baldino, J. Kevin Buchi, William P.*
*Egan, Martyn D. Greenacre, Gail R.*
*Wilensky, Vaughn M. Kailian, Charles A.*
*Sanders, Dennis L. Winger, Kevin E. Moley,*
*and Cephalon, Inc.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATHERINE KRATTENMAKER, derivatively on behalf of CEPHALON, INC., | |
| Plaintiff, | |
| -against- | |
| FRANK BALDINO, J. KEVIN BUCHI, WILLIAM P. EGAN, MARTYN D. GREENACRE, GAIL R. WILENSKY, VAUGHN M. KAILIAN, CHARLES A. SANDERS, DENNIS L. WINGER AND KEVIN E. MOLEY, | NO. 07-CV-101 |
| Defendants, | |
| -and- | |
| CEPHALON, INC., | |
| Nominal Defendant. | |

## ORDER

AND NOW, this ___ day of _____, 2007, upon consideration of the Motion of Defendants for Judgment on the Pleadings (the "Motion"), and any response thereto, it is hereby ORDERED as follows:

   (1) The Motion is granted.

   (2) This action is dismissed with prejudice.

(3) The clerk shall mark this matter closed for statistical purposes.

**AND SO IT IS ORDERED.**

_____
Judge John R. Padova